STATE OF WEST VIRGINIA

*v.*

LARRY DOUGLASS FLINN

(No. CC888)

STATE OF WEST VIRGINIA

*v.*

JERRY DEAN BARKER

(No. CC889)

STATE OF WEST VIRGINIA

*v.*

JERRY GENTRY

(No. CC890)

Decided July 2, 1974.

Rehearing Denied October 17, 1974.

*Chauncey H. Browning,* Attorney General, *Richard E. Hardison,* Deputy Attorney General *David P. Cleek,* Assistant Attorney General, for plaintiff.

*Ralph E. Phillips, Ripley, Goodwin, Goodwin, Bryan & Lobert, Joseph R. Goodwin and John C. Lobert* for defendants.

SPROUSE, JUSTICE:

These three cases are before this Court upon certification by the Circuit Court of Jackson County. The cases, consolidated for the purposes of argument and decision, involve criminal proceedings instituted against Larry Douglass Flinn, Jerry Dean Barker and Jerry Gentry. Jerry Dean Barker and Jerry Gentry were jointly indicted—Larry Douglass Flinn being separately indicted. Each of the defendants were charged with the violation of Code, 1931, 49-7-7, as amended, commonly referred to as the "contributing to the delinquency of a minor" statute.

Code, 1931, 49-7-7, as amended, provides: "A person who by any act or omission contributes to, encourages or tends to cause the delinquency or neglect of any child, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not to exceed five hundred dollars, or imprisoned in the county jail for a period not exceeding one year, or both."

Chapter 49, Article 1, Section 4, Code, 1931, as amended, defines delinquency as follows:

"'Delinquent child' means a person under the age of eighteen years who:

(1) Violates a law or municipal ordinance;

(2) Commits an act which if committed by an adult would be a crime not punishable by death or life imprisonment;

(3) Is incorrigible, ungovernable, or habitually disobedient and beyond the control of his parent, guardian, or other custodian;

(4) Is habitually truant;

(5) Without just cause and without the consent of his parent, guardian, or other custodian, repeatedly deserts his home or place of abode;

(6) Engages in an occupation which is in violation of the law;

(7) Associates with immoral or vicious persons;

(8) Frequents a place the existence of which is in violation of the law;

(9) Deports himself so as to wilfully injure or endanger the morals or health of himself or others."

Upon motions of the defendants in each of these three cases, the indictments were quashed, the circuit court holding that the provisions of Code, 1931, 49-7-7, as amended, were void because they were so vague they violated the Due Process Clauses of the West Virginia and the United States Constitutions. The court, upon its own motion, certified the following questions:

"1. Do the allegations of said indictment charge a violation of the provisions of the Code of West Virginia, Chapter 49, Article 7, Section 7?"

"2. Are the provisions of Code, Chapter 49, Article 7, Section 7, void by reason of vagueness

and thereby violative of the Due Process Clauses of the State and Federal Constitutions?"

If the statute in question is unconstitutional, it would not, of course, be necessary to consider the first certified question. We will first consider the constitutional issue raised by the second certified question.

This Court construed the predecessor statute to Code, 49-7-7, in *State v. Harris,* 105 W. Va. 165, 141 S.E. 637. The earlier statute contained the language, "Any person who shall by any act cause, encourage, or contribute to the delinquency of a child * * * shall be guilty of a misdemeanor." We held in *Harris* that the State was not required to provide the defendant with a bill of particulars, inasmuch as the statutory language was sufficiently definite to apprise the defendant of the crime he was accused of committing. Certain language of the statute involved in *Harris* also was challenged as being unconstitutional. Without discussing a particular constitutional concept, this Court dismissed that contention stating: "'The crime of contributing to the delinquency of a child is complete when acts are committed which directly tend to render the child delinquent, and it is not necessary that the child who is the subject of the crime shall be delinquent or shall become a delinquent child.'" *State v. Harris, supra* at 168, 141 S.E. at 639.

We also said: "The statute clearly defines the offense created thereby; and the indictment is framed in the words of the statute. The Legislature could not possibly inticipate [*sic*] and set out in words every particular act that might constitute the offense." *State v. Harris, supra* at 167, 141 S.E. at 639.

As the trial court, in its opinion declaring Code, 49-7-7 unconstitutional, did not cite *State v. Harris, supra,* it is difficult to determine on what basis it would distinguish the constitutional issue decided by this Court in *Harris* from the one in this case. The defendant, in its brief on appeal, cited *Harris* but made no attempt to distinguish it or ask that it be overruled. The trial court in its opinion indicated that similar statutes are being chal-

lenged in courts of other states and that West Virginia trial courts are uncertain of its constitutionality.

Research indicates that eighteen states, including West Virginia, have interpreted such statutes. Seventeen have held the statutes constitutionally valid. One state, Oregon, has held their statute void as violative of the "delegation of powers" provision of their state constitution. *Anderson v. State*, 384 P.2d 669 (Alaska); *Brockmueller v. State*, 86 Ariz. 82, 340 P.2d 992; *State v. Barone*, 124 So. 2d 490 (Fla.); *People v. Friedrich*, 385 Ill. 175, 52 N.E.2d 120; *McDonald v. Commonwealth*, 331 S.W.2d 716 (Ky.); *People v. Owens*, 13 Mich. App. 469, 164 N.W.2d 712; *State v. Johnson*, 145 S.W.2d 468 (Mo.); *State v. Simants*, 182 Neb. 491, 155 N.W.2d 788; *State v. Montalbo*, 33 N.J. Super. 462, 110 A.2d 572; *State v. McKinley*, 53 N.M. 106, 202 P.2d 964; *State v. Sparrow*, 276 N.C. 499, 173 S.E.2d 897 *cert. denied* 403 U.S. 940; *State v. Crary*, 80 Ohio L. Abs. 417, 155 N.E.2d 262; *State v. Coterel*, 97 Ohio App. 48, 123 N.E.2d 438; *State v. Hodges*, 254 Ore. 21, 457 P.2d 491; *Birdsell v. State*, 205 Tenn. 631, 330 S.W.2d 1; *State v. Tritt*, 23 Utah 2d 365, 463 P.2d 806; *State v. Friedlander*, 141 Wash. 1, 250 P. 453; *State v. Harris*, 105 W. Va. 165, 141 S.E. 637; *Jung v. State*, 55 Wis.2d 714, 201 N.W.2d 58.

At first blush, such overwhelming state precedent, including a decision from this Court, would seem to obviously control the outcome of this case. The defendant on appeal, however, takes the position that the state courts considering the issue have not addressed their decisions to the so-called "void for vagueness" doctrine contained in a number of United States Supreme Court decisions. Apparently the third court thought our decision in *Harris* did not dispose of the Fourteenth Amendment "vagueness" issue tested so frequently in federal cases. At any rate, as that court suggests, the frequency of appellate actions attacking these statutes as being unconstitutionally vague, and the fact that there may be uncertainty in some of our trial courts because of United States Supreme Court decisions in this area, merited the acceptance of these certified questions for review.

One of the fundamental requirements at common law was that a criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute. The Supreme Court of the United States has, during the past half century, molded this former common-law rule into a rule of constitutional law, holding that such definiteness is necessary to satisfy the due process requirements of the Fourteenth Amendment. 21 Am. Jur. 2d *Criminal Law* Section 17, page 97. The "void for vagueness" doctrine, however, is not so much an articulated doctrine as a generic label invented by legal scholars and text writers to encompass a morass of United States Supreme Court decisions concerning the requirement of certainty in diverse areas of criminal law. The Supreme Court has never neatly unitized the concept. 21 Am. Jur. 2d *Criminal Law* Section 17, page 97; 62 Harv. L. Rev. 77; Annot., 97 L. Ed. 203; Annot., 16 L. Ed. 2d 1231; *The Void-For-Vagueness Doctrine in the Supreme Court*, 109 U. Pa. L. Rev. 67.

The general rules were stated early, sketching a shadowy line between language fatally vague and that considered to be permissably general. The Court, on the one hand, stated: "* * * [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Company*, 269 U.S. 385, 391. "* * * [I]t will not do to hold an average man to the peril of an indictment for the unwise exercise of his * * * knowledge involving so many factors of varying effect that neither the person to decide in advance nor the jury to try him after the fact can safely and certainly judge the result." *Cline v. Frink Dairy Company*, 274 U.S. 445, 465.

On the other hand, The Supreme Court in *United States v. Petrillo*, 332 U.S. 1, (1947), interpreted a section of the communications act making it a crime to use

threats, force, etc., to compel the employment of persons "in excess of the number of employees needed by such licensee to perform actual services." The Court said:

> "* * * That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. * * * It would strain the requirement for certainty in criminal law standards too near the breaking point to say that it was impossible judicially to determine whether a person knew when he was wilfully attempting to compel another to hire unneeded employees. * * * *[T]he Constitution does not require impossible standards.* The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more." (Emphasis supplied.) *United States v. Petrillo, supra* at pp. 7-8.

*See also, Jordan v. De George,* 341 U.S. 223, 231, wherein the Supreme Court said: "Impossible standards of specificity are not required." The Court likewise has continued to cite with approval the following language of Mr. Justice Holmes in *Nash v. United States,* 229 U.S. 373, 377: "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death."

Although the general guidelines for vagueness have been anything but clear themselves, there is one principle of the "void for vagueness" doctrine which the United States Supreme Court has clearly defined. Statutes governing potential First Amendment and similarly sensitive constitutional rights will be strictly tested for cer-

tainty by interpreting their meaning from the face of the statutes. *Thornhill v. Alabama*, 310 U.S. 88: General criminal statutes, not touching on potential rights of individuals in First Amendment or other constitutional areas sensitive to abuse by potential maladministration of a system of justice, are tested for vagueness not only from examining the face of the statute but by considering the statute in the light of the conduct in which it is applied. *United States v. National Dairy Products Corp.*, 372 U.S. 29.

In *Thornhill*, Mr. Justice Murphy said:

> "* * * [T]here is no occasion to go behind the face of the statute or of the complaint for the purpose of determining whether the evidence, together with the permissible inferences to be drawn from it, could ever support a conviction founded upon different and more precise charges * * *.

> "There is a further reason for testing the section on its face. Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas." *Thornhill v. Alabama, supra* at 96-97.

The *Thornhill* opinion also stated: "A like threat is inherent in a penal statute, * * * which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama, supra* at 97.

Similarly, in *Ashton v. Kentucky*, 384 U.S. 195, the Supreme Court, upon striking down a criminal libel conviction because the common-law crime was too imprecisely defined, stated: "Here, as in the cases discussed above, we deal with First Amendment rights. Vague laws in any area suffer a constitutional infirmity. When

First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer. We said in *Cantwell v. Connecticut, supra,* that such a law must be 'narrowly drawn to prevent the supposed evil' * * *." *Ashton v. Kentucky, supra* at 200-01.

*Papachristou v. City of Jacksonville,* 405 U.S. 156, involved the constitutionality of a Florida vagrancy statute. The Supreme Court held the ordinance penalizing loitering constitutionally void for vagueness. The Court said: "This ordinance is void for vagueness, both in the sense that it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' * * * and because it encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville, supra* at 162. The Supreme Court further noted the unfettered discretion placed by the ordinance in the hands of the police. The Court stated: "Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.' * * * It results in a regime in which the poor and the unpopular are permitted to 'stand on a public sidewalk ... only at the whim of any police officer.'" *Papachristou v. City of Jacksonville, supra* at 170.

In *Cox v. Louisiana,* 379 U.S. 536, the Supreme Court interpreted a statute which prohibited pickets or parades "in or near a building housing a court" with the intent to obstruct justice. The Court said:

"* * * There is an equally plain requirement for laws and regulations to be drawn so as to give citizens fair warning as to what is illegal; for regulation of conduct that involves freedom

of speech and assembly not to be so broad in scope as to stifle First Amendment freedoms, which 'need breathing space to survive;' *NAACP v. Button,* 371 U.S. 415, 433; for appropriate limitations on the discretion of public officials where speech and assembly are intertwined with regulated conduct; and for all such laws and regulations to be applied with an equal hand. We believe that all of these requirements can be met in an ordered society dedicated to liberty." *Cox v. Louisiana, supra* at 574.

*See also, Yick Wo v. Hopkins,* 118 U.S. 356, where the Court strictly interpreted a statute regulating conduct involving other than First Amendment rights. *Yick Wo* interpreted a statute by which the State of California attempted to discriminate against Chinese in the operation of laundries. *See also, Hague v. C.I.O.,* 307 U.S. 496, for a similar interpretation of an ordinance administered arbitrarily in granting parade permits.

The basic rule governing testing of statutes for vagueness where First Amendment or other sensitive constitutional rights are not involved was articulated in *United States v. National Dairy Products Corp.,* 372 U.S. 29, 36, where the Court said:

"* * * [W]e also note that the approach to 'vagueness' governing a case like this is different from that followed in cases arising under the First Amendment. There we are concerned with the vagueness of the statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct. * * * No such factor is present * * * where the statute is directed only at conduct designed to destroy competition, activity which is neither constitutionally protected nor socially desirable. We are thus permitted to consider * * * the statute 'on its face' [and] in the light of the conduct to which it is applied."

*Nash v. United States, supra,* is an early example of this category of cases which frequently involve economic control statutes. Similar cases are: *United States v. National Dairy Products Corp., supra; McGowan v. Maryland,* 366 U.S. 420; *United States v. Ragen,* 314 U.S. 513; *Cline v. Frink Dairy Company, supra; Connally v. General Construction Company, supra; Edgar A. Levy Leasing Company, Inc. v. Siegel,* 258 U.S. 242; *United States v. L. Cohen Grocery Company,* 255 U.S. 81.

*Levy Leasing* upheld the validity of New York State rent control legislation, which allowed as a defense to a landlord's actions his tenant showing that the rent charged was "unjust and unreasonable." *Ragen* upheld a conviction for tax evasion under a statute allowing an exclusion for "reasonable allowances for salaries." *National Dairy Products* upheld section 3 of the Robinson-Patman Act which made it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor." *McGowan* upheld a Sunday closing law which exempted the Sunday retail sales of merchandise customarily sold at, or incidental to, the operation of bathing beaches, etc. The Court pointed out that business people of ordinary intelligence would be able to know what exceptions were encompassed by the statute either as a matter of commercial knowledge or simply by making a reasonable investigation of a nearby bathing beach or amusement park within the county.

On the other hand, the Court held unconstitutionally vague the statute involved in *United States v. L. Cohen Grocery Company, supra* providing a penalty for "any unjust or unreasonable rate or charge in handling * * * any necessaries." *Cline,* in considering the Colorado Anti-Trust Law, held unconstitutionally vague a statute prohibiting conspiracies or combinations in restraint of trade, except when necessary to obtain "a reasonable profit." *Connally* held unconstitutional a statute imposing a penalty upon contractors working with the state who paid less than the "current rate of per diem wages".

Certainly, it is to some degree puzzling that the Court in *Nash, Levy Leasing, Ragen, McGowan* and *National Dairy Products* held constitutional as sufficiently definite and certain very similar, or in some cases the exact type language, held to be unconstitutionally vague in *L. Cohen Grocery Company, Cline* and *Connally*. A reasonable explanation is that the Court, in applying the *National Dairy Products* rule, considered "the statute * * * in the light of the conduct to which it is applied" and found this first group constitutional as applied, and the second unconstitutional as applied.

Likewise, the Supreme Court used this approach in *Lanzetta v. New Jersey*, 306 U.S. 451, and found the statute, which penalized "gangsters" and certain other categories of individuals unconstitutional. The Court held "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey, supra* at 453. There are, of course, statutes which could not be valid as applied to any facts. *See, for example, Giaccio v. Pennsylvania*, 382 U.S. 399, where the Supreme Court voided a statute permitting a jury to assess costs after a finding of acquittal. The statute contemplated the jury inflicting some intermediate type punishment upon an otherwise acquitted defendant. The Court said:

> "* * * This 1860 Pennsylvania Act contains no standards at all, nor does it place any conditions of any kind upon the jury's power to impose costs * * *.
>
>       *     *     *
>
> "* * * It would be difficult if not impossible for a person to prepare a defense against such general abstract charges as 'misconduct,' or 'reprehensible conduct.'" *Giaccio v. Pennsylvania, supra* at 403-04.

In *United States v. Vuitch*, 402 U.S. 62, the Court considered a District of Columbia statute which made the

performance or attempted performance of an abortion a crime. The statute prohibited abortions not "necessary for the preservation of the mother's life or health." The defendant was indicted for producing and attempting to produce abortions in violation of the statute. The Court construed the statute as permitting abortions for both physical and mental health reasons whether or not patients had previous histories of mental defects and so construed was not unconstitutionally vague.

In *Cole v. Richardson*, 405 U.S. 676, the Supreme Court upheld a state statutory loyalty oath requiring public employees to swear or affirm to uphold and defend federal and state constitutions, etc. The Court held that, since there is no constitutionally protected right to overthrow a government by force, no constitutional right is infringed upon by the oath. The case involves First Amendment freedoms, but the Court held that oaths of this type are consistent with the First Amendment. The Court has decided a number of other loyalty oath cases, deciding some of the statutes constitutionally definite and others unconstitutionally vague. In each of these cases the Court has considered the type of conduct regulated, that is, the type of oath or activity proscribed. *The Void-For-Vagueness Doctrine in the Supreme Court*, 109 U. Pa. L. Rev. 67, 105-109.

In *Adderley v. Florida*, 385 U.S. 39, the Supreme Court reviewed convictions of demonstrators under a Florida trespass statute for "trespass with a malicious and mischievous intent." The Court again applying the statute to the facts, which involved a demonstration on the premises of a jail, held that the statute was not unconstitutionally vague.

If it is true, as the trial court below indicated in its opinion, that some trial courts in our State are uncertain of whether the "void for vagueness" decisions apply to Code, 49-7-7, the uncertainty may have been caused by failure to differentiate which statutes must be tested

for vagueness "on their face" and which are tested "in light of the conduct" regulated and as applied to the facts. The Supreme Court has provided several interpretive aids to be applied to statutes in this latter category. By the use of these aids statutes using general terms can be rendered permissibly certain by "common understanding and practices", *Petrillo v. United States, supra* at 8; "the general usage and modern understanding" of words, *United States v. Vuitch,* 402 U.S. 62, 72; "ordinary commercial knowledge or by simply making a reasonable investigation", *McGowan v. Maryland, supra* at 428.

If intent is a prerequisite to guilt for a statutory offense, otherwise general language of a statute may for that reason be considered constitutionally definite. In *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, the Supreme Court interpreted a statute requiring drivers of motor vehicles transporting inflammables or explosives to "avoid, so far as practicable, * * * driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, * * * dangerous crossings." The statute provided: 'Whoever knowingly violates any such regulation shall be fined * * * or imprisoned * * *." The Court, in upholding the statute, said, among other things: "The statute punishes only those who knowingly violate the Regulation. *This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid."* (Emphasis supplied.) *Boyce Motor Lines, Inc. v. United States, supra* at 342.

Although a "general crime" type statute contains vague or indefinite language if the statute has gained certainty from its interpretation by the state court, it may satisfy due process requirements.

In *Chaplinsky v. New Hampshire,* 315 U.S. 568, the Supreme Court considered a New Hampshire statute forbidding under penalty any individual from calling another person "any offensive, derisive or annoying

word." The Court, in upholding the statute based on the interpretation of the statute previously given by the Supreme Court of New Hampshire, said:

> "The state statute here challenged comes to us authoritatively construed by the highest court of New Hampshire. * * *

> "On the authority of its earlier decisions, the state court declared that the statute's purpose was to preserve the public peace, no words being 'forbidden except such as have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed.'" *Chaplinsky v. New Hampshire, supra* at 572-73.

The effect of the statute as construed by the New Hampshire Court was to prohibit no more than "the face-to-face words plainly likely to cause a breach of the peace by the addressee." The Court went on to say: *"We are unable to say that the limited scope of the statute as thus construed contravenes the Constitutional right of free expression."* (Emphasis supplied.) *Chaplinsky v. New Hampshire, supra* at 573.

In *Musser v. Utah,* 333 U.S. 95, the Supreme Court considered a conviction of conspiracy "to commit acts injurious to public morals," in violation of a Utah statute. The Supreme Court of Utah had not passed upon certain constitutional aspects of the statute. The Supreme Court of the United States remanded the case to the Utah court for its interpretation saying: "* * * What the statutes of a State mean, the extent to which any provision may be limited by other Acts or by other parts of the same Act, are questions on which the highest court of the State has the final word. The right to speak this word is one which State courts should jealously maintain and which we should scrupulously observe." *Musser v. Utah, supra* at 98.

Similarly, the Supreme Court, in interpreting statutes not involving First Amendment rights, apply the gener-

al rule of statutory construction that a statute will be construed if possible to give it a constitutional meaning. *See, Fox v. Washington*, 236 U.S. 273. In *Fox*, the Supreme Court reviewed a statute from the State of Washington which provided a penalty for "[e]very person who shall wilfully print * * * knowingly circulate * * * or display any book, paper * * * advocating, encouraging or inciting, or having a tendency to encourage or incite the commission of any crime, breach of the peace or act of violence * * *." The Court said: "So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed * * * and it is to be presumed that state laws will be construed in that way by the state courts. We understand the state court by implication, at least, to have read the statute as confined to encouraging an actual breach of law. Therefore the argument that this act is both an unjustifiable restriction of liberty and too vague for a criminal law must fail." *Fox v. Washington, supra* at 277. In *United States v. Harriss*, 347 U.S. 612, 618; the Supreme Court has also stated: "On the other hand, if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise. * * * And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction."

Decisions of the United States Supreme Court in the void for vagueness area have been so pervasive that a synthesis of them for purposes of judicial decision can realistically be no more than an overview. Nevertheless, the cases and discussions cited above are representative of the Supreme Court's action in various areas of statutory regulations, transactions, and conduct. A close analysis of the decisions, we believe, indicates the kind of certainty the United States Supreme Court has held necessary for any statute to satisfy the due process re-

quirements of the Fourteenth Amendment. In spite of defendant's protestations that decisions from the various states have not been addressed to United States Supreme Court criteria, many of those state decisions have used similar reasoning.

*McDonald*, *Barone*, and *Simants* took the same approach as did this Court in *Harris* and simply dismissed the objection of vagueness by holding that the general terms of the act were necessary to effectuate legislative intent and the number of possible acts were too great to specify. *McKinley*, *Montalbo*, and *Anderson* were based on the theory that the additional statutory definitions of "delinquent" added such clarity and specificity to "contributing" language as to make it constitutionally definite. In addition, *McKinley* held that the common sense of the community, coupled with the sense of decency, propriety and morality entertained by most people, was sufficient to apply the statute and point out what conduct is criminal. To the same effect is *Coterel*, holding, among other things, that the language sufficiently conveyed definite warning as to proscribed conduct when measured by common understanding and practice. In *Tritt*, the statute was upheld in part upon the ground that the terms delinquency and contributing to delinquency had for many years had such widespread usage as to give clear and understandable meaning. In *Crary*, an Ohio court in construing the statute of that state, established certain standards not apparent on its face. Emphasizing the requirement for strict construction, the court stated that Ohio courts seemed to apply the statute in the following manner: (1) The delinquency the law is trying to prevent must be fairly evident; (2) it must be a reasonably certain result of the act complained of; and (3) it must be reasonably sure to befall a child within a reasonable time. The casual connection must be clear and a delinquent act be reasonably sure to follow.

The Oregon court declared their statute unconstitutional, discussing very generally the United States Supreme Court "void for vagueness doctrine", but deciding

the case under the Oregon Constitution prohibiting delegation of legislative power. *State v. Hodges, supra.*

Applying these principles to the West Virginia "contributing" statute, we hold first that Code, 49-7-7, and Code, 49-1-4, defining delinquency must be considered in pari materia. "Statutes relating to the same subject, regardless of the time of their enactment and whether the later statute refers to the former statute, are to be read and construed together and considered as a single statute the parts of which had been enacted at the same time. Point 1, syllabus, *Delardas v. Morgantown Water Commission*, 148 W. Va. 776." *State v. Reel*, 152 W. Va. 646, pt. 1 syl., 165 S.E.2d 813. Construed together, these sections make it a misdemeanor for a person who "by any act or omission contributes to, encourages or tends to cause" the delinquency of a child by causing a child to: (1) Violate a law or municipal ordinance; (2) commit an act which if committed by an adult would be a crime not punishable by death or life imprisonment; (3) be incorrigible, ungovernable or habitually disobedient, etc.; (4) be habitually truant; (5) without the consent of his parent, etc., to repeatedly desert his home or place of abode; (5) engage in an occupation which is a violation of law; (7) associate with immoral or vicious persons; (8) frequent a place the existence of which is a violation of law; and (9) deport himself so as to wilfully injure or endanger the morals or health of himself or others.

The general rule, promulgated both by the Supreme Court of the United States and this Court, requires resort to every reasonable construction to sustain constitutionality. *United States v. Harriss, supra; Fox v. Washington, supra; Willis v. O'Brien*, 151 W. Va. 628, 153 S.E.2d 178. Disregarding initially the language in Code, 49-7-7, "contributes to, encourages or tends to cause * * *", it is clear that an otherwise definite prohibition penalizing an individual for causing a child to commit any one of the acts contained in subsections 1, 2, 3, 4, 5, 6, and 8 of *Code* 49-1-4 would apprise a prospective defendant of a potential crime with specificity and,

likewise, would permit the adjudication of the crime with procedural fairness to the defendant.

We might, under the mandate to construe a statute to be constitutional, if possible, superimpose on subsections 7 and 9 of Code, 49-1-4, standards of reasonable certainty by judicial interpretation. However, the language of subsection 7, "immoral or vicious persons", is so broad and subjective in nature that there is an inherent danger that a trial court could not keep purely subjective standards out of the consideration of juries. Likewise, the language of subsection 9, "injure or endanger the morals or health of himself or others", is so utterly subjective that an attempt to make it certain would strain the interpretative process. *State ex rel. Hawks v. Lazaro*, W. Va.   , 202 S.E.2d 109 (1974). These subsections, as was said in *Giaccio v. Pennsylvania*, 382 U.S. 399, 403, contain "no standards at all * * *."

However, a statute may be constitutional in one part and unconstitutional in another.

> "A statute may contain constitutional and unconstitutional provisions which may be perfectly distinct and separable so that some may stand and the others will fall; and if, when the unconstitutional portion of the statute is rejected, the remaining portion reflects the legislative will, is complete in itself, is capable of being executed independently of the rejected portion, and in all other respects is valid, such remaining portion will be upheld and sustained. Syllabus Point 6, *State v. Heston*, 137 W. Va. 375." Syllabus Point 6 *Nuckols v. Athey*, 149 W. Va. 40, 138 S.E.2d 344.

We hold that subsections 7 and 9 of *Code* 49-1-4 are void as violative of the Due Process Clauses of Article III, Section 10, of the Constitution of West Virginia and the Fourteenth Amendment of the United States Constitution.

These subsections, however, can be separated from the remaining subsections of Code, 49-1-4, and if the lan-

guage in Code, 49-7-7, "contributes to, encourages or tends to cause" does not of itself violate due process as being too vague, the remaining parts of Code, 49-1-4, minus subsections 7 and 9 read in pari materia with Code, 49-7-7, are sufficiently definite to satisfy those constitutional requirements.

There remains the task of judicially measuring for certainty the language "contributes to, encourages or tends to cause".

Professor Ernst Fruend categorized certainty in the language of statutes in three classes. Precisely measured terms, abstractions of common certainty, and terms involving an appeal to judgment or a question of degree. He stated that the great majority of statutes operate with the middle grade of certainty.

> "* * * The language of the law always aims at precision, while the language of politics favors vagueness and ambiguity, for the former is chosen with a view to the ultimate arbitrament of a court of justice, the latter with a view to immediate effect upon sentiment or opinion. Some of the most general clauses of American constitutions are phrased politically rather than legally, but they are more legal in form than the Declaration of Independence; * * *.

> "Abstractions of common certainty may be furnished by words of popular usage, by technical terms, or by circumscribing definitions. No general rule can be laid down as to which of these serve statutory purposes best, although a good deal might be said about the illusory certainty of some technical terms, and of cumulations and qualifications sanctioned by traditional practice. Every common abstraction has its 'marginal' ambiguity, which mere elaboration of definition cannot altogether remove.

> * * *

> "It is otherwise with regard to the third class of terms, those representing the lowest grade of certainty, which may be characterized, if we

think of them favorably, as flexible, if we think of them unfavorably, as indefinite. They involve either an appeal to judgment, or a question of degree. The former category is represented by such terms as reasonable, proper, sufficient, suitable, necessary; * * *. The latter category is represented by such terms as nuisance, coercion, undue influence, immorality, depravity, reputability, sedition, unprofessional conduct, unfairness, unsightliness, restraint of trade * * *. Some of these latter terms have the sanction of common-law recognition, while others represent new standards of which the common law did not take cognizance. * * * From the legislative point of view, facility of formulation counts in their favor. From the point of view of official administration and individual application, flexibility or indefiniteness has the double aspect of liberty and peril." Freund, *The Use of Indefinite Terms in Statutes*, 30 Yale L. Rev. 437, 437-38.

It has been stated that the language which has been virtually the exclusive target of void for vagueness cases is "that which falls in Professor Freund's third category: terms of judgment and degree. Here are *Cohen's* 'unreasonable' charges, *Cline's* 'unreasonable' profits, *Winters'* 'so massed as to become vehicles for inciting', *Herndon's* 'reasonable time', *Burstyn's* 'sacreligious', and *International Harvester's* 'real' price. *The Void-For-Vagueness Doctrine in the Supreme Court*, 109 Pa. L. Rev. 67, 92-93.

"Contributes to, encourages or tends to cause" appears to be in a middle ground between Professor Freund's "abstractions of common certainty" and his third group "terms involving an appeal to judgment". The terms are certainly general. It cannot be said, however, that they are more general than many "abstractions of common certainty" or "terms involving an appeal to judgment" which permeate both the civil and criminal law. Many have been given meaning by common usage and judicial interpretation or traditional use—such as negligence, wantonness, malice, presump-

tion, conspiracy, prima facie, insanity, premeditation, aiding and abetting, and terms involved in fixing the various degrees of murder.

A judicial system administered under the Anglo-American tradition of partially inductive laws would utterly fail if it could not successfully utilize such general terms by giving to them traditional specificity.

This has been nowhere better stated than by Justice Holmes in *Nash*:

> "'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' * * * 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' * * * If a man should kill another by driving an automobile furiously into a crowd, he might be convicted of murder, however little he expected the result. * * * If he did no more than drive negligently through a street, he might get off with manslaughter or less. * * * And in the last case he might be held although he himself thought that he was acting as a prudent man should." *Nash v. United States, supra* at 377-78.

There can be no doubt that the Supreme Court of the United States, in interpreting the due process requirements of the Fourteenth Amendment, has required greater specificity in statutes attempting to regulate certain areas of the lives of our citizens. *Ashton v. Kentucky, supra; Thornhill v. Alabama, supra.* We are, of course, bound by those decisions and for that matter would apply those same distinctions in interpreting Article III, Section 10, of the West Virginia Constitution. The reasons for this are obvious and are rooted deeply in

both our political and judicial history. They have nowhere been stated more concisely and pertinently than by Mr. Justice Cardoza in his opinion in *Palko v. Connecticut*, 302 U.S. 319. Speaking as to what Bill of Rights' protections have been absorbed in the Fourteenth Amendment so as to apply to actions by the states, Justice Cardoza said:

> "* * * If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed. * * * This is true, for illustration, of freedom of thought and speech. Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom. With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal. So it has come about that the domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states, has been enlarged by latter-day judgments to include liberty of the mind as well as liberty of action. The extension became, indeed, a logical imperative when once it was recognized, as long ago it was, that liberty is something more than exemption from physical restraint, and that even in the field of substantive rights and duties the legislative judgment, if oppressive and arbitrary, may be overridden by the courts." *Palko v. Connecticut, supra* at 326-27.

The Supreme Court has gone even further than the First Amendment and broadly categorized certain areas wherein citizens should be given greater protection against possible arbitrary or frivolous actions by legislatures or state courts. In these instances, the Court has required the same type of certainty or definitiveness in statutes, and in actions by states regulating the conduct of its citizens by penal actions, when it appears that a statute or law is being used as an oppressive weapon selectively against individual or a group of individuals. *Papachristou v. City of Jacksonville, supra; Yick Wo v. Hopkins, supra; Hague v. C.I.O., supra.*

The certainty of other "general criminal" statutes is to be judged in relation both to the type of conduct regulated and the factual situation involved in the particular proceeding. It is here that the United States Supreme Court gives great weight in determining vagueness or specificity to the interpretation by state appellate courts. This was indicated by strong and specific language in *Chaplinsky*, *Musser*, and *Fox*. Additionally, *Petrillo* and *Boyce* indicate that a requirement of intent adds specificity to an otherwise vague statute.

It is in the context of these decisions that we must interpret Code, 49-7-7. We find that the language read in pari materia with Code, 49-1-4, is sufficiently specific and certain to provide adequate notice. It is not "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," and as we interpret it, it gives reasonable standards under which a defendant's rights can be adjudicated.

The Supreme Court in *Cole* indicated that since there was no protected right to overthrow the government by force or violence, the First Amendment afforded no protection against a requirement of an oath to that effect. In *National Dairy Products*, the Court stated that the act of destroying economic competition was "neither constitutionally protected nor socially desirable." *United States v. National Dairy Products Corp., supra* at 36.

In a different context no citizen has a protected right to corrupt the morals of children. Such an area of possible crime cannot be coated with the same dignity as a possible statutory prohibition which might sweep "within its ambit other activities that might in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama, supra* at 97. The vagueness or certainty of Code, 1931, 49-7-7, as amended, is not to be judged in the abstract. The language of the statute is to be judged according to the conduct it purports to regulate and the facts of the offense it purports to punish. Certainly all defendants have equal rights under the Due Process Clauses of the State and Federal Constitutions.

In this category of criminal statutes, however, it is not necessary to erect the same inflexible rules as is required in the First Amendment area. The right to walk the streets unfettered by improperly motivated police action cannot be equated with an alleged right to furnish a child intoxicating liquor or to have sexual intercourse with a child.

General criminal statutes, of course, can be so generally worded as to be violative of due process. Subsections 7 and 9 of Code, 49-1-4, are examples. All that is necessary, however, is that they be worded in such a way as to give a reasonably intelligent person notice of a potential crime and to present adequate standards for adjudication in light of the conduct to which they are applied. The keystone is that the concept of "ordered liberty" shall be the ruling factor in the administration of criminal justice and the adjudication of individual rights or guilt in that process. The preservation of Fourteenth Amendment rights requires the preservation of an ordered society. The phase "ordered liberty," employed by Justice Cardozo in *Palko v. Connecticut, supra,* and since frequently employed in constitutional opinions, is not an empty phrase nor is the term "ordered" merely a parasiticidal adjective for liberty. "Both halves of the rubric are critical." *The Void-For-Vagueness Doctrine in the Supreme Court,* 109 U. Pa. L. Rev. 67, 115. It is necessary that order be preserved so that liberty might be protected.

Due process of law means a functioning of government by protection and guidance. It does not mean anarchy. It does not mean the continuous polarization of the judicial branch of government. We, therefore, must limit the scope of appellate supervision to maintaining in balance an ordered liberty. In so doing, some acts of individuals must give way to ordered society. One cannot expect the privilege of driving an automobile one hundred miles an hour through a crowded street because he is exhilarated by speed, or to rape a voluptuous sixteen year old girl because his sensual appetites have been aroused. The legislature's proscription of these and less spectacular

forbidden activities must be given some credence and administered with judicial common sense by our trial courts.

A parade of horrors certainly can be imagined whereby an innocent stranger passerby might in some vague or indirect way contribute to the delinquency or neglect of a child and his action fall within the strict definition of Code, 49-7-7. Such *reducio ad absurdum* argument will not invalidate such a statute on the basis of vagueness simply because it is equally absurd to apply such an argument. We cannot assume that courts frivolously administer the law. In our view, although not specifically set out in the statutory language, Code, 49-7-7, requires an element of intent before a person can be guilty of contributing to, encouraging or tending to cause the delinquency or neglect of a child. To paraphrase *Petrillo*: It would strain the requirement for certainty in criminal law standards too near the breaking point to say that it was impossible judicially to determine whether a person knew he was wilfully contributing to, encouraging or tending to cause a child to commit an act defined in subsections 1, 2, 3, 4, 5, 6, and 8 of Code, 1931, 49-1-4.

We would hope that our trial courts have always applied this statute with specificity. The language of *State v. Harris, supra*, however, may not have indicated this requirement. We hold, therefore, as the Ohio court did in *Crary*, that such delinquency must be a reasonably certain result of the act complained of and reasonably sure to befall a certain child in a reasonable time. The causal connection must be clear and a delinquent act be reasonably sure to follow.

In view of the above, Code, 49-7-7, construed in *pari materia* with subsections 1, 2, 3, 4, 5, 6, and 8 of Code, 49-1-4, is not void for vagueness under the Due Process Clauses of Article III, Section 10, of the Constitution of West Virginia and the Fourteenth Amendment of the Constitution of the United States. The second certified question is answered in the negative, therefore, as it relates to the indictments in these cases. Inasmuch as

138

subsections 7 and 9 of Code, 49-1-4, are hereby held to be unconstitutionally vague, the second certified question is answered in the affirmative insofar as it relates to those subsections.

The first certified question which we now consider is: "Do the allegations of said indictment charge a violation of the provisions of the Code of West Virginia, Chapter 49, Article 7, Section 7?"

The joint Barker-Gentry indictment was in three counts as follows:

> "That JERRY DEAN BARKER and JERRY GENTRY on the ____ day of June, 1973, in the said County of Jackson, and within (1) year before the finding of this indictment, did unlawfully by act contribute to, encourage and tend to cause the delinquency of a child, to-wit: * * * a female infant under the age of eighteen (18) years by procuring for and giving to the said * * * non-intoxicating beer against the peace and dignity of the State.

> "SECOND COUNT: And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that the said JERRY DEAN BARKER and JERRY GENTRY on the ____ day of June, 1973, in the said County of Jackson, and within one (1) year before the finding of this indictment, did unlawfully by act contribute to, encourage and tend to cause the delinquency of a child, to-wit: * * * a female infant under the age of eighteen (18) years by procuring for and giving to the said * * * non-intoxicating beer against the peace and dignity of the State.

> "THIRD COUNT: And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that the said JERRY DEAN BARKER and JERRY GENTRY on the ____ day of June, 1973, in the said County of Jackson, and within one (1) year before the finding of this indictment, did unlawfully by act contribute to, encourage and tend to cause the delinquency of a child, to-wit:

* * * a female infant under the age of eighteen (18) years by engaging in sexual intercourse with the said * * * against the peace and dignity of the State."

The indictment charging Larry Douglass Flinn was in two counts as follows:

"That LARRY DOUGLASS FLINN did on the ____ day of May, 1973, and within one (1) year before the finding of this indictment, in the said County of Jackson, unlawfully by acts contribute to, encourage and tend to cause the delinquency of a child, to-wit: * * * a female infant, under the age of eighteen (18) years, in that he, the said Larry Douglass Flinn, did sell, give and deliver to the said * * * intoxicating liquor and by enticing and taking her, the said * * * away from the public schools of Jackson County while said schools were duly in session, against the peace and dignity of the State.

"SECOND COUNT: And the Grand Jurors aforesaid, do further present that the said Larry Douglass Flinn did on the ____ day of May, 1973, and within one (1) year before the finding of this indictment, in the said County of Jackson, unlawfully by acts contribute to, encourage and tend to cause the delinquency of a child, to-wit: * * * a female infant, under the age of eighteen (18) years, in that he, the said Larry Douglass Flinn, did sell, give and deliver to the said * * *, intoxicating liquor and by enticing and taking her, the said * * *, away from the public schools of Jackson County while said schools were duly in session, against the peace and dignity of the State."

This question was not raised in the lower court by the defendant nor briefed on this appeal. It was certified, however, by the trial court on its own motion. This certified question raises the question of what is necessary in an indictment to sufficiently describe an offense. The rule has been stated a number of times by this Court. It was expressed concisely in *State v. Zitzelsberger*, 129 W.

Va. 229, 232, 39 S.E.2d 835, 836-37, wherein this Court said:

> "As a general rule, allegations of an indictment for an offense based on a legislative enactment are sufficient if they follow the words of the statute. However, if the description of the offense is given in the statute in general terms, an indictment based thereon must amplify the statutory description by alleging the specific act or conduct constituting the offense."

*See also, State ex rel. Turner v. McClure,* 153 W. Va. 855, 173 S.E.2d 167. This Court specifically considered this question relating to the statutory predecessor to Code, 49-7-7, in *State v. Harris, supra.* It was held that Chapter 46A, Code, 1923, was clear in defining the offense of "contributing" to the delinquency of a minor and an indictment framed in the terms of the statute was sufficient.

The indictments in this case have been previously set out. There was a joint indictment of Barker and Gentry in three counts. In each of the three counts, the alleged offense was set out in the general language of the statute, *i.e.,* "did unlawfully by act contribute to, encourage and tend to cause the delinquency of a child, to-wit: * * *." The indictments then amplified the statutory language by alleging specific acts by each separate count.

There was a separate indictment of Flinn in two counts. Here again the same scheme was utilized. The general language of the state was set out in each count which was completed by alleging a specific act as a violation of the statute.

The specific acts alleged in the Barker-Gentry indictments were: (1) Procuring and giving to a female child non-intoxicating beer; (2) procuring and giving to a second child non-intoxicating beer; and (3) engaging in sexual intercourse with one of the children. The two specific allegations against Flinn were that he sold, gave and delivered to two female children intoxicating liquor and enticed them away from school while school was in ses-

sion. The indictments use the general words of the statute and set out the specific offenses alleged. It is clear that this satisfied the requirements announced in *Zitzelsberger* and *Harris*. For these reasons the first question certified is answered in the affirmative.

For reasons stated in this opinion, the rulings of the Circuit Court of Jackson County are reversed.

*Rulings on certified*
*questions reversed.*